UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF PENNSYLVANIA

Dee Lawrence Downs
    (petitioner),

13-cr-67

v.

United States of America
    (respondant),

## MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO THE FIRST STEP ACT OF 2018

Now comes the Petitioner, Dee Lawrence Downs, pro se, and Petitions this Honorable Court to GRANT Petitioner's request and motion for compassionate release, pursuant to the new rules laid out in the newly passed congressional "FIRST STEP ACT of 2018"; and due to compelling and extraordinary circumstances, and in support thereof states the following:

### (I. HISTORY OF THE CASE)

Petitioner was arrested on or around January 17th 2013. Petitioner plead to count one in violation of 21 U.S.C. § 841(b)(1)(A); conspriacy to distribute (5 kilograms or more of cocaine) and possess with the intent to distribute; and was later sentenced on or around November 17th, 2014 by Judge John Padova; to (120) Months.

The record shows within Petitioner's PSR report, that the recomendation offer to the Court by the Probation Office was 87 months yet the Court was forced to levy a 120 month sentence pursuant to the statute of the Court.

Petitioner at the time of this filing has served about (60) months (5-years); and thus, with good time and alike; has about 36-months remaining of his sentence. Had Petitioner been sentenced to the appropriate guideline range proffered by the Probation Office;

-1-

Petitioner would actually be in-line with time served and thus his request due to the extraordinary and compelling circumstances is not inconsistent with other court decisions of defendant's whom would be granted such relief pursuant to a filing under compassionate release consideration.

As a matter of legal consequences, per FRAP; Defendant's should be sentenced to a fair amount of time, but not more than necessary when the Court is to consider and/or levy a sentence.

Petitioner has appropriately exhausted all the required remedies cited herein The First Step Act of 2018. (See Attachment of required remedies completed):·

## II. LEGAL BACKGROUND

On December 21, 2018, the President signed the First Step Act into law. Among the criminal justice reforms in the bill, Congress amended 18 U.S.C. § 3582(c)(1)(A)(i) to provide the sentencing judge jurisdiction to consider a defense motion for reduction of sentence based on extraordinary and compelling reasons whenever "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf." or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier [.]" First Step Act of 2018, §603(b), Pub. L. 115-391, 132 Stat. 5194 5239, (Dec. 21, 2018).

Prior to the passage of the First Step Act, motions for compassionate release could only be filed with the court by the Bureau of Prisons. The First Step Act gave prisoners the right to petition the court directly because the Bureau of Prisons had failed to meaningfully exercise its authority to pursue compassionate release for those who were eligible. See e.g., Department of Justice, Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program, at 11 (April 2013), (hereinafter "OIG Compassionate Release Report") ("The BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered.") See Also Department of Justice

-2-

Office of the Inspector General, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons, at 51 (May 2015) (hereinafter "OIG Report on Aging Inmates") (Although the BOP has revised its compassionate release policy to expand consideration for early release to           inmates, which could help mitigate the effects of a growing aging inmate population few aging inmates have been released under it").(2)

However, other compassionate cases not involving aging inmates have been GRANTED most recently across the District Courts (Appeal in similar request being made by Petitioner.

The First Step Act not only gave prisoners the right to petition the Court directly for compassionate release, but it also required the Bureau of Prisons, within one year of the passage of the Act, to report to Congress on the use of compassionate release, see 18 U.S.C. §3582(d)(3), a clear indication that Congress intended that more individuals receive compasionate release than had perviously. See, e.g., Schatz Legislation on Compassionate Prison Release Passes Senate in Sweeping Criminal Justice Reform Bill, Brian Schatz, United States Senator for Hawai'i (Dec 18, 2018) ("Too many people who are eligible for compassionate release die in prison because the decision takes so long. And many others wait for months just to get to prison and to get a response. Clearly, the system is broken.")(3); Schatz leads Bipartisan Group of Senators. Urging DOJ to Expand compassionate Sentence Reduction Program for Sick and Elderly Inmates, Address Rising Prison Costs and improve Public Safety, Brian Schatz, United States Senator for Hawai'i (Aug. 3, 2017) ("[T]he sentencing Court, rather than the BOP, is best suited to decide if the prisoner des-erves  compassionate release....BOP should make the compassionate release program more efficent and use that authority to the full extent provided by the Commission's guidance.") ("[T]his legislation includes several positive reforms from the House-passed FIRST STEP act.... The bill expands compassionate release under the Second Chance Act and expedites compasisionate release applications").

---

1      Available at https://oig.justice.gov/reports/2013/e1306.pdf.
2      Available at https://oig.justice.gov/reports/2015/e1505.pdf#page=

This Court has discretion to reduce the term of imprisonment imposed in this case based on § 3582(c)(1)(A)(i), which states in relevant part that the Court "may reduce the term of imprisonment after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable, if it finds that.... extraordinary and compelling reasons warrant such a reduction.... and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission [.]" In 28 U.S.C. §994(t), Congress delegated to the Sentencing Commission the authority to "describe what should be considered extraordinary and compelling reasons for sentence reductions, including the criteria to be applied and a list of specific examples."

Congress commentary also expressly states that "the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement." Id. n.2

The Commission's standard has parallels under the Bureau of Prisons (BOP) program statement on compassionate release PS 5050.50 Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g), at 4-5 (Jan. 17, 2019) (providing compasionate release consideration for inmates. Under the First Step Act, the Bureau of Prisons' program statement is relevant now only to the extent that its criteria are broader than the standards set by the Commission. U.S.S.G. § 1b1.13 n.1 (D) (recognizing that the Director of the Bureau of Prisons can designate additional "extraordinary and compelling reason[s] other than, or in combination with, the reasons described in "extraordinary and compelling reason[s] other than, or in combination with, the reasons described in" the commentary). In other words, based on § 994(t)'s delegation of authority to the Sentencing Commission and the Commission's statement that the BOP can create additional grounds to meet the "extraordinary and compelling" standard, the Bureau of Prisons can create additional grounds for relief but cannot limit those set forth by the Commission in § 1B1.13.

---

3       Available at https://www.schatz.senate.gov/press-releases/schatz-legislation-on-compassionate-prison-release-passes-senate-in-sweeping-criminal-justice-reform-bill.

4       Available at https://www.schatz.senate.gov/press-releases/schatz-leads-bipartisan-group-of-senators-in-urging-doj-to-expand-compassionate-sentence-reduction-program-for-sick-and-elderly-inmates-address-rising-prison-costs-and-improve-public-safety.

### III. STATEMENT OF RELIEF SOUGHT

Petitioner has spent his time incarcerated in a productive manner. Petitioner's progress report shows significant efforts made to rehibilitate himself by programming and completing about (800) hours over his 5-years in prison. From parenting classes taken and completed; to business law; to banking classes; to advanced anatomy and physiology (AND ALIKE) to name just a few courses undertaken; (See attachments of Certificates of Completion of a few of the course completed), Petitioner made it his mission to transform himself despite the personal hardships suffered towards his son; and the dabilitating aging and failing health of his parents.

### PETITIONER'S MOTHER FAILING HEALTH:

Petitioner's mother is currently 83-years old, unable to drive and in need of major assistance. She resides in Philidelphia PA.and with little to no one able to take care for her needs on a daily basis . In fact; as of 2019 Doctor's have written the following concern Petitioner's mother's failing health such as:

RE:              Joan S Downs
MRN:            347013658
Date of Birth:   4/22/1937
Date of Visit:   10/31/2019

October 31, 2019

To Whom It may Concern

Mrs. Downs is under my care for a chronic neurodegenerative condition, Parkinson disease. She was last seen in the office on October 31, 2019. Parkinson Disease is progressive, and currently cannot be prevented or cured.  Currently, Mrs. Downs is exhibiting reduced benefit from her Parkinson disease medications and has very prominent symptoms at times.  Because of disease symptoms and severity, she is at risk of having negative health events leading to hospitalization or worse. The amount of time she will have without significant disability cannot be predicted. I recommend that she receive familial support, which may include in-person support from her children.  Please consider Mrs. Downs health in your decision making to allow Mr. Downs' furlough request.

Sincerely,

Allison Willis, MD

(Note: See Attachment #1 - of the complete official letter).

The Doctor's have made it perfectly clear to Petitioner when the Doctor's explained that, "without proper care on a consistent basis, your mother's health will get continually worse."

Petitioner prays the Court will consider this a need for compassionate release  (along with consideration of his Father's healh)

### PETITIONER'S FATHER'S FAILING HEALTH:

Petitioner's father is currently 88-years old, a veteran who is in a rehabilitation facility for care and requires specialized post hospital care upon discharge. (See attachment #2 - Official letter from the Doctor of Petitioner's father)

What must not be overlooked is that, Petitioner's parents have been married for over 50-years and counting. Also, when together; this couple still owns and resides in Petitioner's childhood home although, the parents raised 8-children; Petitioner due to the living location of all other children Petitioner would be the only one able to properly care for his aging parents. Other siblings do not live in the Pennsylvania Area; and sadly the one sibling in close proximity to care for their parents, died in 2016 - Petitioner's middle sister.

### PETITIONER'S FATALLY UNEXPECTED INJURY TO HIS SON (LAWRENCE DOWNS)

Petitioner's son is currently 36-years old at the time of this Petition being filed with the Court. OF devistating results at the hands of Micheal Lockart, whom acting as  a "chameleon" living a double life; being an agent serving as an informant for the Bureau of Alcohol, Tabacco, Firearms and explosives and rolling with a west Philadelphia drug gang. On August 18, 2015, Lockart and two other men shot Petitioner's son, Lawrence Downs, and thus fatally paralyzing him. Lockart testified to hatching the plot to ambush Lawrence Downs, when Lawrence was shot 14-times near his own home. (See attachments # 4-5of a series of articles detailing the horrific callamidy created at the hands of Lockart.(5)

-6-

In review of Attachment #5, the article reads like a horror movie that is inescapably hard to imagine. The article lays out just how deep Lockart had involved himself into a Federal Agency and to what extent and powers that would make any gangster jealous. THe Bureau's own admission that they saw Lockart as a valuable resource to the ATF agency. Although Lockart was supposed to follow strict rules not to commit any new crimes and signed an agreement with the "ATF Bureau" acknowledging he understood this; Lockart did everything but abide by the law.

Of grave consequences, the record proves that a Federal Agency allowed criminals to run the streets assisting the ATF in creating more crimes; crimes that ultimatly lead to Petitioner's son to be shot senselessly, and thus having an adult male, absent of his father care, causing unimaginable harship to    Lawrence Downs and Petitioner's family.

## IV. CONCLUSION

Petitioner prays the Court will consider the factors listed herein this motion, where the BOP (nor a parole commission), no longer has jurisdiction over such decisions pertaining to compassionate relief request, of important note; Congress reiterated (while contemplating) that rehabilitation of a defendant could now be considered for relief along side other "extraordinary and compelling" reasons sufficent to resentence people in individual cases.

In fact, Congress provided only one limitation to the Court's sole discretion and delegation of authority; stating, "Rehabilitation of the defendant could now be considered for relief along side other "extraordinary and compelling", shall not be considered an extraordinary and compelling reason to grant relief.

So in light of only one limitation, Petitioner cites additional reasons in which he seeks relief and for consideration beyond just his stellar programming such as:

---

Footnote (5): The complete series and story can be found at https://
www.inquirer.com/philly/news/crime/undercover-gangster
-micheal-lockart-sentenced-joe-murray-20180112.html; and part
3-surprise-twist-another-crime-scene-2017115.html

1) The Court (by its own admission) stated that it
   did not want to sentence Petitioner to the manda-
   tory -minimum of 10-years ; but was unfortunately
   forced to base on the statue of the offense. The
   record proves that the probation office felt com-
   pelled to go below the suggested guidelines to
   87 months yet the Court's hands were tied at the
   time of sentencing (6)

2) Based on Petitioner's current incarceration time
   of (60) months; and if you add good time,along
   with the newly passed congressional guarantee
   of at least (6) months minimum of home confine-
   ment and/or halfway house time (AND ALIKE), Pet-
   itioner would be close to the suggested PSR
   report proffered by the Probation Office at the
   time of sentencing. (7).

3) Petitioner's parents (both) dabilatating health,
   and unmaned care upon them vacating; hopital and
   rehab facilities that only Petitioner's could
   address due to living location of family members
   not living in the same state as the parents in
   Pennsylvania PA.

4) Petitioner's son being gun down by a U.S. Federal
   (ATF) Agency; that led to the paralyzing of Petitioner's
   son; whom also struggles with care giving due to
   age and size of his now very depressed son
   Lawrence Downs.

---

Footnote (6): Petitioner has also fully paid in full his FRP
         (7): Prior to sentencing Petitioner was out on bail, with
              no further legal issues, and self-surrendered on time

In Sum, Petitioner could not imagine that all of his siblings would ' be to far away to properly care for their parents. Incrediabily the Govt knew that they had a volatile mad-man on their hands in Micheal Lockart, that ran the streets shooting whomever he felt crossed him; even when he had no proof that it was individuals who were never proven to have committed a crime or act of violence against him (Lockart). This complete lack of care and monitoring of Lockart, led to the fatal shooting of Petitioner's son; that has caused incurable damage to Petitioner's entire family; all while Petitioner worked his behind off to better himself and completing 800 hours of programming. (See Attachment #3- Programming sheet).

Wherefore, Dee Lawrence Downs, (Petitioner), pro se, motion, humbly requests that pursuant to the newly passed First Step Act 2018, specifically Section Pursuant to Compassionate Release Petitioner prays after careful review of his claims for relief, the Court will Grant Petitioner's motion for (ALL), reasons proffered and further relief deemed proper and necessary in the Interest of Justice.

DATED: March 17 ____, 2020

Respectfully Submitted,

Dee Lawrence Downs Pro Se
Fed No.: 46528-066

## AFFIDAVIT

I Hereby Certify that the foregoing facts are true and correct to the best of my knowledge and belief under penalty of perjury as per 28 USC Section 1746.

Dee Lawrence Downs, Pro Se

## CERTIFICATE OF SERVICE

I hereby Certify that a copy of the foregoing Petition/Motion was mailed on this _24th_ day of _March_, 20²⁰, by First Class Mail, postage preparid to:

AUSA:
Office of the U.S Attorney
L.C. Wright
Eastern District of Pennsylvania
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106-4476

Dee Lawrence Downs, Pro Se

ATTACHMENTS # 1-5

11/04/2019



Penn Medicine

**Department of Neurology**

Pennsylvania Hospital

Allison W. Willis, MD, MSCI
Parkinson's Disease & Movement Disorders

RE:        Joan S Downs
MRN:      347013658
Date of Birth:
Date of Visit:  10/31/2019

October 31, 2019

To Whom It may Concern

Mrs. Downs is under my care for a chronic neurodegenerative condition, Parkinson disease. She was last seen in the office on October 31, 2019.  Parkinson Disease is progressive, and currently cannot be prevented or cured.   Currently, Mrs. Downs is exhibiting reduced benefit from her Parkinson disease medications and has very prominent symptoms at times.  Because of disease symptoms and severity, she is at risk of having negative health events leading to hospitalization or worse. The amount of time she will have without significant disability cannot be predicted. I recommend that she receive familial support, which may include in-person support from her children.  Please consider Mrs. Downs health in your decision making to allow Mr. Downs' furlough request.

Sincerely,

Allison Willis, MD

Allison W. Willis, MD, MSCI
Movement Disorders Specialist, Parkinson Disease & Movement Disorders Center
Associate Professor of Neurology and of Epidemiology & Biostatistics
University of Pennsylvania Perelman School of Medicine

Attachment #1

1 2



**Department of Veterans Affairs**
**Medical Center**
**3900 Woodland Avenue**
**Philadelphia PA 19104**

October 21, 2019

Mr. Dee Downs is a patient of Dr. Bruce Kinosian.  Mr. Downs is
currently hospitalized for an indeterminate amount of time.  Mr.
Downs will require specialized post hospital care upon discharge.

Sincerely,

Randolph Ruffin RN

Geriatrics Team

Primary Care Clinics

Philadelphia VA Medical Center
Primary Care Clinic (215) 823-5212

Attachment #2

13

```
 10/28/2019            ** WORK COPY - NOT FOR MEDICAL RECORD **
PHILADELPHIA VAMC                        10/22/2019 17:38    Page:  1
```
--------------------------------------------------------------------------

| PATIENT NAME | AGE | SEX | SSN | CLAIM NUMBER |
|---|---|---|---|---|
| DOWNS,DEE | 87 | M | ▓▓▓▓▓ | 19076018 |

| ADM DATE | DISC DATE | TYPE OF RELEASE | INP | ABS | WARD NO |
|---|---|---|---|---|---|
| OCT 19, 2019 | | | | | |

--------------------------------------------------------------------------

```
DICTATION DATE: OCT 22, 2019        TRANSCRIPTION DATE: OCT 22, 2019
LOCAL TITLE: DISCHARGE INSTRUCTIONS AND SUMMARY PHI
STANDARD TITLE: DISCHARGE SUMMARY
TRANSCRIPTIONIST: bh
```

## DISCHARGE INSTRUCTIONS

Patient Information:
====================
Name: DEE DOWNS
Date of Birth:

Admission Information:
=====================
Date of Admission: Oct 19,2019
Date of Discharge: Oct 22,2019

Discharged to: SNF

Attending Physician at Discharge:
===============================

First name Bruce
Last name  Hopper
Diagnoses:
---------

Primary Diagnosis for Admission:  UTI, falls

Secondary Diagnoses Addressed During Admission:  bladder outlet obstruction w chronic indwelling foley c/b recurrent UTIs, HFrEF, and progressive dementia

Does the patient smoke?

TOBACCO USER STATUS
   PT DOES NOT USE TOBACCO/TOBACCO PRODUCTS        10/17/2019

   No data available for ACCEPTS CESSATION COUNSELING;
DECLINES CESSATION COUNSELING

   No
Medicine/Surgery Discharge-------------------------------------------------

Operations and Procedures:
==========================
None

PATIENT: DOWNS,DEE                      VA FORM 10-1000 DISCHARGE SUMMARY
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  DOB: 10/26/1931                             C O P Y
```

14

10/28/2019          ** WORK COPY - NOT FOR MEDICAL RECORD **
PHILADELPHIA VAMC                        10/22/2019 17:38        Page:   2
-----------------------------------------------------------------------
PATIENT NAME                | AGE | SEX |      SSN       | CLAIM NUMBER
DOWNS,DEE                   |  87 |  M  | ▓▓▓▓▓▓▓▓▓▓     | 19076018
-----------------------------------------------------------------------
ADM DATE    |  DISC DATE   | TYPE OF RELEASE   | INP | ABS | WARD NO
OCT 19, 2019 |             |                   |     |     |
-----------------------------------------------------------------------

Discharge Medications:
=====================

1)   ACETAMINOPHEN (OTC) TAB  325MG PO Q4H PRN pain       ACTIVE
2)   ASPIRIN (OTC) TAB,CHEWABLE  81MG PO QDAY             ACTIVE
3)   BRIMONIDINE SOLN,OPH  1 DROP OU Q8H                  ACTIVE
4)   DORZOLAMIDE/TIMOLOL SOLN,OPH  1 DROP OU Q8H          ACTIVE
5)   FUROSEMIDE TAB  20MG PO QDAY                         ACTIVE
6)   GALANTAMINE (ONCE DAILY) CAP,SA  24MG PO QDAY        ACTIVE
7)   LATANOPROST SOLN,OPH  1 DROP OU QHS                  ACTIVE
8)   LOSARTAN TAB  50MG PO QDAY                           ACTIVE
9)   MULTIVITAMIN OPH FOR SMOKERS/NONSMOKERS  1 CAP PO BID ACTIVE
        AC
10)  OXYBUTYNIN CHLORIDE TAB  5MG PO Q8H PRN bladder      ACTIVE
        spasms
11)  PETROLATUM/MINERAL OIL (OTC) CREAM,TOP  MODERATE     ACTIVE
        AMOUNT TOP QDAY
12)  BACTRIM DS  1 TABLET PO BID                          ACTIVE
13)  SIMVASTATIN TAB  20MG PO QHS                         ACTIVE
14)  VITAMIN D (OTC) TAB  1000UNIT PO QDAY                ACTIVE

Medication Instructions:
======================== Re-order medications when 10-14 day supply remaining by
calling the VAMC Pharmacy at (215) 823-6361.
No additional medication instructions

Medication Reconciliation:
=========================  This list of medications was created after careful
review of the medications you were taking before admission to the hospital
and any medications given in the hospital, as well as any changes in your
health status which has been observed.  Please keep
a list of your current medications with you at all times to show to your
medical providers whenever necessary. Keep your list
up to date by writing down any changes as they are made.

Diet:
====
- Low Sodium: Avoid foods that contain added salt including
  Worcestershire sauce, soy sauce, onion salt, garlic salt,
  bouillon cubes, processed meats, such as bacon, sausage, and
  ham, canned soups and vegetables. Also you must avoid fast foods,
  processed foods such as potato chips, and frozen dinners.

Activity:
========
No restrictions.

PATIENT: DOWNS,DEE                      VA FORM 10-1000 DISCHARGE SUMMARY
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   DOB: 10/26/1931      15                        C O P Y

```
ALFEY           *          INMATE EDUCATION DATA          *      11-17-2019
PAGE 001          *            TRANSCRIPT                  *      08:40:24


REGISTER NO: 46528-066      NAME..: DOWNS                FUNC: PRT
FORMAT.....: TRANSCRIPT     RSP OF: ALF-ALLENWOOD LOW FCI


------------------------- EDUCATION INFORMATION --------------------------
FACL ASSIGNMENT DESCRIPTION                  START DATE/TIME STOP DATE/TIME
ALF  ESL HAS    ENGLISH PROFICIENT           09-14-1993 1452 CURRENT
ALF  GED HAS    COMPLETED GED OR HS DIPLOMA  09-27-1993 1411 CURRENT
```

```
--------------------------- EDUCATION COURSES ----------------------------
SUB-FACL    DESCRIPTION                      START DATE  STOP DATE EVNT AC LV  HRS
ALF         ARTICULAR & MUSCLE SYSTEMS       10-08-2019 10-22-2019  P   C  P   20
ALF         THE SKELETAL SYSTEM              09-10-2019 09-24-2019  P   C  P   20
ALF         TISSUES & INTEGUMENTARY SYSTEM   08-06-2019 08-20-2019  P   C  P   20
ALF         CELL STRUCTURE METAB & REPRO     07-09-2019 07-23-2019  P   C  P   20
ALF         UNIV CHILD DAY PARNT CLSS        07-12-2019 07-12-2019  P   C  P    6
ALF         ACE TYPING FOR BEGINNERS         04-22-2019 06-24-2019  P   C  P   20
ALF         HUMAN BODY & CHEMISTRY OF LIFE   06-04-2019 06-18-2019  P   C  P   20
ALF         STRESS MGT & LIFE FIT & WELL     05-07-2019 05-21-2019  P   C  P   20
ALF         PREV STI & ADDICTIVE BEHAVIOR    04-09-2019 04-23-2019  P   C  P   20
ALF         PREV CARDIO DISEASE & CANCER     03-05-2019 03-19-2019  P   C  P   20
ALF         MUSC ENDURANCE & COMP FIT PRG    02-05-2019 02-19-2019  P   C  P   20
ALF         WGT MNGMT & CADIO ENDURANCE      01-08-2019 01-28-2019  P   C  P   20
ALF         NUTRITION, WELL & BODY COMP      12-04-2018 12-24-2018  P   C  P   20
ALF         FOOD INFORMATION                 10-16-2018 12-04-2018  P   C  P    8
ALF         WEIGHT MANAGEMENT                10-16-2018 12-04-2018  P   C  P    8
ALF         PHYS FIT, WELL & BEHAVIOR MOD    11-06-2018 11-26-2018  P   C  P   20
ALF         NON-RESIDENTIAL DRUG PRG         05-14-2018 10-02-2018  P   C  P   30
ALF         ACE AARP FINANCES 50+ PROGRAM    08-31-2018 09-04-2018  P   C  P   10
ALF         UNIV CHILD DAY PARNT CLSS        07-13-2018 07-13-2018  P   C  P    6
ALF         ACE BRICK WALLS CLASS            04-30-2018 05-04-2018  P   C  P   10
ALF         JUMP ROPE                        11-01-2017 12-28-2017  P   C  P    2
ALF         RP6-INSIDE OUT DAD PARNT PROG    09-11-2017 09-25-2017  P   C  P   12
ALF         BEGINNERS SPINNING               07-17-2017 09-09-2017  P   C  P    4
ALF         JUMP ROPE                        05-01-2017 06-22-2017  P   C  P    2
ALF         VIDEO NUTRITION CLASS            03-01-2017 04-18-2017  P   C  P    8
ALF         WELLNESS VIDEO CLASS             03-01-2017 04-19-2017  P   C  P    8
ALF         ALL ABOUT DIABETES               03-01-2017 04-19-2017  P   C  P    8
MRG         VETERAN'S RE-ENTRY PROGRAM       12-16-2015 02-03-2017  P   C  P    1
MRG         VETERANS - GENERAL INFORMATION   10-19-2016 10-19-2016  P   C  P    1
MRG         GET FIT 2 CLASS                  07-11-2016 09-16-2016  P   C  P   10
MRG         VETERANS - WELLNESS              04-28-2016 04-28-2016  P   C  P    1
MRG         VETERANS - GENERAL INFORMATION   04-28-2016 04-28-2016  P   C  P    1
MRG         GET FIT 1 CLASS                  04-11-2016 06-17-2016  P   C  P   10
MRG         ADVANCED ANATOMY & PHYSIOLOGY    04-11-2016 06-17-2016  P   C  P   10
MRG         VETERANS - GENERAL INFORMATION   03-03-2016 03-03-2016  P   C  P    1
ELK         SPINNING, M, W, F 10 AM          09-23-2015 01-21-2016  P   C  P    2
ELK         SPINNING M 6 PM                  09-22-2015 01-21-2016  P   C  P    2
ELK         SPINNING M 7 PM                  09-22-2015 01-21-2016  P   C  P    1
ELK         CRAFT STICK CLASS                11-30-2015 01-19-2016  P   C  P    8
MRG         RPP1 - AIDS/DISEASE PREVENT      12-28-2015 12-28-2015  P   C  P    1
```

```
G0002       MORE PAGES TO FOLLOW . . .
```

Attachment #3

16

```
ALFEY          *         INMATE EDUCATION DATA        *      11-17-2019
PAGE 002 OF 002 *              TRANSCRIPT             *      08:40:24


REGISTER NO: 46528-066   NAME..: DOWNS                FUNC: PRT
FORMAT.....: TRANSCRIPT   RSP OF: ALF-ALLENWOOD LOW FCI
```

| SUB-FACL | DESCRIPTION | START DATE | STOP DATE | EVNT | AC | LV | HRS |
|----------|-------------|------------|-----------|------|-----|-----|-----|
| ELK | INTRODUCTION TO FITNESS | 04-30-2015 | 08-21-2015 | P | C | P | 2 |
| ELK | AIDS AWARENESS-RPP<HN> | 01-14-2015 | 01-14-2015 | P | C | P | 1 |
| ELK | DIVERSITY AWARENESS-RPP<PG> | 01-14-2015 | 01-14-2015 | P | C | P | 1 |
| ELK | CREDIT-RPP | 07-22-2000 | 07-29-2000 | P | C | P | 2 |
| ELK | BANKING-RPP | 07-15-2000 | 07-22-2000 | P | C | P | 2 |
| ELK | ADVANCED FITNESS PROGRAM | 04-19-2000 | 06-05-2000 | P | C | P | 12 |
| SCH | BUSINESS LAW II | 06-12-1995 | 09-08-1995 | P | C | P | 15 |
| SCH | FCI PRINCIPLES OF ECONOMICS | 01-10-1995 | 04-21-1995 | P | C | P | 28 |
| SCH | PRINCIPLES OF ACCOUNTING | 01-12-1995 | 04-21-1995 | P | C | P | 26 |
| SCH | INTRO TO MANAGEMENT MG-101 | 01-09-1995 | 04-21-1995 | P | C | P | 30 |
| SCH | BUSINESS LAW | 01-11-1995 | 04-21-1995 | P | C | P | 28 |
| SCH | FCI PRINCIPLES OF ECONOMICS | 09-15-1994 | 12-27-1994 | P | C | P | 33 |
| SCH | PRINCIPLES OF ACCOUNTING | 09-06-1994 | 12-27-1994 | P | C | P | 35 |
| SCH | INTERM.MACROECONOMICS EC-301 | 09-12-1994 | 12-27-1994 | P | C | P | 30 |
| SCH | ORGANIZATIONAL BEHAVIOR MG-390 | 01-10-1994 | 05-05-1994 | P | C | P | 33 |
| SCH | COLLEGE ENGLISH II EN-102 | 01-13-1994 | 05-02-1994 | P | C | P | 30 |
| SCH | POST SECONDARY ED EVENING | 10-04-1993 | 01-13-1994 | P | C | P | 56 |

```
G0000      TRANSACTION SUCCESSFULLY COMPLETED
```





www.fatherhood.org

# LETTER OF COMPLETION

September 25, 2017

This letter certifies that Dee Lawrence Downs has successfully completed the evidence-based InsideOut Dad® program.

The InsideOut Dad® program was designed by National Fatherhood Initiative® to help incarcerated fathers:

- Develop pro-fathering attitudes, knowledge, and skills.

- Improve relationships with their children and the mother of their children (or main caregiver of their children).

- Develop a plan for successfully reentering the lives of their children and families upon release.

The InsideOut Dad® program has gone through several independent evaluations that have shown it to improve the pro-fathering attitudes, knowledge, and skills of incarcerated fathers.

Dee Lawrence Downs has completed the program, thus helping him to be a better father and co-parent.

Sincerely,

Rebecca George
Teacher
LSCI Allenwood
White Deer, PA

# Certificate of Completion

This certifies that

## Dee Lawrence Downs

has successfully completed the



Program

Conducted on _____ September 12-25, 2017

in _____ LSCI Allenwood

Rebecca George/Teacher
Facilitator's Name/Signature



National
Fatherhood
Initiative®
www.fatherhood.org

Carlos Alcazar
Chairman of the Board
NATIONAL FATHERHOOD INITIATIVE®

Christopher A. Brown
Executive Vice President
NATIONAL FATHERHOOD INITIATIVE®

19



# Certificate of Completion

L.S.C.I. Allenwood

THIS CERTIFIES THAT

## Dee Downs

*The Allenwood Education Department*

*White Deer, Pennsylvania*

has been recognized for completion of the Brick Walls course, 10 hours of study, for the 2018 school year and is hereby awarded this certificate of completion.

Given this date: May 4, 2018.

_____
Supervisor of Education

_____
Instructor

20



# Certificate of Achievement

Psychology Department
Allenwood, Pennsylvania

This Certifies that

## Dee Downs

has satisfactorily completed the

# Non-Residential Drug Abuse Program

This Certificate is hereby issued this 1st day of October, 2018

J. Brown, Drug Treatment Specialist

21

*Federal Correctional Complex*
*LSCI Recreation Department*
*Allenwood, PA*

### CERTIFICATE OF
# COMPLETION

This certificate is awarded to

DOWNS, D   46528-066

for successfully completing

COURSE 1: PHYSICAL FITNESS, WELLNESS AND BEHAVIOR MODIFICATION



Consisting of 20 Hours of Training

Awarded

NOVEMBER, 2018

_____
D. Kniebel, Assistant,
Supervisor of Recreation

_____
J. LOCKE
Recreation Specialist

22

*Federal Correctional Complex*
*LSCI Recreation Department*
*Allerwood, PA*

## CERTIFICATE OF

# COMPLETION

This certificate is awarded to

DOWNS, D  46528-066

for successfully completing

FOOD INFORMATION



Wellness

Awarded

DECEMBER,  2018

Consisting of 8 Hours of Training

J. LOCKE
Recreation Specialist

D. Kriebel, Assistant
Supervisor of Recreation

23

*Federal Correctional Complex*
*LSCI Recreation Department*
*Allenwood, PA*

# CERTIFICATE OF COMPLETION

This certificate is awarded to

DOWNS, D   46528-066

for successfully completing

WEIGHT MANAGEMENT



Wellness

Consisting of 8 Hours of Training

_____
J. JOCKE
Recreation Specialist

Awarded

DECEMBER, 2018

_____
D. Kriebel, Assistant
Supervisor of Recreation

24

Federal Correctional Complex
LSCI Recreation Department
Allenwood, PA

# CERTIFICATE OF COMPLETION

This certificate is awarded to

DOWNS, D   46528-066

for successfully completing

COURSE 2: NUTRITION FOR WELLNESS AND BODY COMPOSITION

Consisting of 20 Hours of Training



LOCKE
Recreation Specialist

Awarded

DECEMBER, 2018

D. Kriebel, Assistant
Supervisor of Recreation

25

*Federal Correctional Complex*
*LSCI Recreation Department*
*Allenwood, PA*

CERTIFICATE OF

# COMPLETION

This certificate is awarded to

DOWNS, D  46528-066

for successfully completing

COURSE 3: WEIGHT MANAGEMENT AND CARDIORESPIRATORY ENDURANCE



Consisting of 20 Hours of Training

Awarded

JANUARY, 2019

D. Kriebel, Assistant
Supervisor of Recreation

J. Hocke
Recreation Specialist

26

Federal Correctional Complex
LSCI Recreation Department
Allenwood, PA

CERTIFICATE OF

# COMPLETION

This certificate is awarded to

DOWNS, D 46528-066

for successfully completing

COURSE 4: MUSCULAR ENDURANCE AND COMPREHENSIVE FITNESS PROGRAMMING

Consisting of 20 Hours of Training





Awarded

FEBRUARY, 2019

D. Kriebel, Assistant
Supervisor of Recreation

J. Hocke
Recreation Specialist

Federal Correctional Complex
LSCI Recreation Department
Allenwood, PA

CERTIFICATE OF

# COMPLETION

This certificate is awarded to

DOWNS, D  46528-066

for successfully completing

COURSE 5: PREVENTING CARDIOVASCULAR DISEASE AND MANAGING CANCER RISK

Consisting of 20 Hours of Training



Awarded

MARCH,  2019

_M. Trump_
Recreation Specialist

_A Soe_
Assistant
Supervisor of Recreation

28

*Federal Correctional Complex*
*LSCI Recreation Department*
*Allenwood, PA*

# CERTIFICATE OF COMPLETION



This certificate is awarded to

DOWNS, D  46528-066

for successfully completing

COURSE 6: PREVENTING SEXUALLY TRANSMITED INFECTIONS AND ADDICTIVE BEHAVIOR

Consisting of 20 Hours of Training

Awarded

APRIL, 2019

_____
M. Trutop
Recreation Specialist

_____ ACTING FOR
Assistant
Supervisor of Recreation

29

Federal Correctional Complex
LSCI Recreation Department
Allenwood, PA

CERTIFICATE OF

COMPLETION

This certificate is awarded to

DOWNS, D  46528-066

for successfully completing

COURSE 7: STRESS MANAGEMENT AND LIFETIME FITNESS AND WELLNESS

Consisting of 20 Hours of Training



Wellness

Awarded

MAY, 2019

M. Briskie, Assistant
Supervisor of Recreation

M. Trump
Recreation Specialist

30

*Federal Correctional Complex*
*LSCI Recreation Department*
*Allenwood, PA*

# CERTIFICATE OF COMPLETION

This certificate is awarded to

DOWNS, D  46528-066

for successfully completing

COURSE 8: HUMAN BODY AND CHEMISTRY OF LIFE



Consisting of 20 Hours of Training

M. Trump
Recreation Specialist

Awarded

JUNE, 2019

M. Briskie, Assistant
Supervisor of Recreation

31

*Federal Correctional Complex*
*LSCI Recreation Department*
*Allenwood, PA*

# CERTIFICATE OF

# COMPLETION

This certificate is awarded to

DOWNS, D   46528-066

for successfully completing

COURSE 9: CELL STRUCTURE, CELLULAR METABOLISM AND REPRODUCTION

Awarded

JULY, 2019



M. Briskie, Assistant
Supervisor of Recreation

Consisting of 20 Hours of Training

M. Trump
Recreation Specialist

32

# Federal Correctional Complex
## LSCI Recreation Department
### Allenwood, PA

### CERTIFICATE OF

# COMPLETION

This certificate is awarded to

DOWNS, D.  46528-066

for successfully completing

COURSE 10: TISSUES AND THE INTEGUMENTARY SYSTEM



Awarded

AUGUST, 2019

M. Briskie, Assistant
Supervisor of Recreation

Consisting of 20 Hours of Training

M. Trump
Recreation Specialist

33

Federal Correctional Complex
LSCI Recreation Department
Allenwood, PA

### CERTIFICATE OF

# COMPLETION

This certificate is awarded to

DOWNS, D.     46528-066

for successfully completing

COURSE 11: SKELETAL SYSTEM



Wellness

Consisting of 20 Hours of Training

M. Trump
Recreation Specialist

Awarded
SEPTEMBER, 2019

M. Briskie, Assistant
Supervisor of Recreation



34

*Federal Correctional Complex*
*LSCI Recreation Department*
*Allenwood, PA*

CERTIFICATE OF



COMPLETION

This certificate is awarded to

DOWNS, D.   46528-066

for successfully completing

COURSE 12: ARTICULAR SYSTEM AND THE MUSCULAR SYSTEM

Consisting of 20 Hours of Training



Wellness

Awarded
OCTOBER, 2019



M. Briskie, Assistant
Supervisor of Recreation

M. Trump
Recreation Specialist

35

# The Inquirer

Unlimited Access    Log In

NEWS    SPORTS    BUSINESS    OPINION    POLITICS    ENTERTAINMENT    LIFE    FOOD    HEALTH    REAL ESTATE    OBITUARIES

# 'Undercover Gangster' Michael Lockhart slammed with 30 to 60 years in prison

by David Gambacorta, Posted: January 22, 2018



JESSICA GRIFFIN

"I think you are a very dangerous gentleman."

Those were among the final words that Common Pleas Court Judge Mia Roberts-Perez uttered to Michael Lockhart on Monday before delivering a pair of stiff sentences to the North Philadelphia native, whose shocking double life was detailed by the Inquirer and Daily News last year in the series "Undercover Gangster."

36

Assistant District Attorney Cydney Pope recounted for Roberts-Perez how adept Lockhart had been at juggling different identities, dividing his time among volunteering with a local anti-violence nonprofit, serving as an informant for the Bureau of Alcohol, Tobacco, Firearms and Explosives, and rolling with a West Philadelphia drug gang.

That last role proved to be Lockhart's undoing. On Aug. 18, 2015, Lockhart and two other men shot Lawrence Downs in West Philadelphia, paralyzing him.



Pope argued that the shooting was the result of an elaborate plot hatched by Lockhart, who had stolen three handguns that belonged to a local drug kingpin, and then covered his tracks by blaming the theft on Downs and two other men, Hassan Williams and Kashif Love. Lockhart eagerly helped plan the daytime ambush on Downs, who was shot 14 times near his house on Angora Terrace near 55th Street.

Downs was left paralyzed, while Williams was killed several days later. No one has been charged in connection with Williams' death, but Pope said Lockhart provided the handgun that was used to commit the crime. Love was never attacked.

**INQUIRER MORNING NEWSLETTER**

Get the news you need to start your day

your@email.com                                                                 Sign Up

Lockhart, 22, pleaded guilty in September to attempted murder, aggravated assault, conspiracy, and a handful of related charges for shooting Downs. Five other men who were involved in the ambush had separately pleaded guilty as well.

But before Roberts-Perez sentenced Lockhart for his role in the Downs saga, Lockhart pleaded guilty to another crime as well. On June 15, 2015, he and two other men barged into an 82-year-old woman's home in West Philadelphia. Lockhart and his cohorts brandished handguns and ran through the woman's house, stealing a safe that belonged to her grandson and terrifying her, her teenage granddaughter and another female relative.

Detective Joe Murray, who gradually untangled the vast web of Lockhart's lies and crimes in the summer and fall of 2015, described Lockhart as a "chameleon" on Monday. "He assesses the situation," Murray testified, "and adapts to be what you want him to be."

37

But before Roberts-Perez sentenced Lockhart for his role in the Downs saga, Lockhart pleaded guilty to another crime as well. On June 15, 2015, he and two other men barged into an 82-year-old woman's home in West Philadelphia. Lockhart and his cohorts brandished handguns and ran through the woman's house, stealing a safe that belonged to her grandson and terrifying her, her teenage granddaughter and another female relative.

Detective Joe Murray, who gradually untangled the vast web of Lockhart's lies and crimes in the summer and fall of 2015, described Lockhart as a "chameleon" on Monday. "He assesses the situation," Murray testified, "and adapts to be what you want him to be."

Edward Meehan, Lockhart's attorney, said "both crimes are horrific incidents," but noted that Lockhart had accepted responsibility for his actions. He asked Roberts-Perez for a sentence of 15 to 30 years for the attempted murder charges, and five to 10 years for the home invasion case.

Lockhart sat quietly in the seventh floor courtroom inside the Justice Juanita Kidd Stout Center for Criminal Justice as Roberts-Perez read out his punishment. He wore a long black robe, and his beard was trimmed to a point. He spoke briefly, offering apologies to the families of his victims, and asked the judge to give him a chance to turn his life around.

The judge was unmoved.

"You manipulate people for your own benefit," Roberts-Perez said to Lockhart, and then sentenced him to 30 to 60 years — 15 to 30 years for shooting Downs, and 15 to 30 years for the home invasion, which, she said, made victims out of "the most vulnerable of our society." The sentences will be served consecutively, and Lockhart also received 10 years of probation.

"I hope that we were able to give all of the victims of the crimes he was charged with at least a modicum of closure and justice," Pope said afterward. "They can know that the person who crafted and masterminded all of this won't be able to hurt anyone else for a long time."

Meehan declined to comment.



Posted: January 22, 2018 - 2:41 PM
**David Gambacorta | @dgambacorta | dgambacorta@inquirer.com**

Never Miss a Story

Subscribe

38

Case 2:13-cr-00067-JP   Document 50   Filed 06/05/20   Page 39 of 55

10/8/19, 10:26 AM

NEWS   SPORTS   BUSINESS   OPINION   POLITICS   ENTERTAINMENT   LIFE   FOOD   HEALTH   REAL ESTATE   OBITUARIES   JOBS

## Undercover Gangster



IN THEIR FATHERS' FOOTSTEPS

PORTRAIT OF A SUSPECT

ANOTHER TWIST, ANOTHER CRIME

INTERROGATION

# Another Twist, Another Crime Scene

PART 3

Story by David Gambacorta

*Illustrations by Amy Junod*



Wednesday, November 15, 2017

 e knew he was getting closer.

Detective Joe Murray started to feel confident about the attempted murder case he was building against Michael Lockhart, but there were still so many loose threads.

Single, with no children, he worked on the investigation even on his off days, which wasn't unusual. When his father would pop into his son's downtown apartment for a quick visit, he often found his son silently studying surveillance footage from one crime or another.

Attachment #5

39

Murray had to figure out why Lockhart shot Lawrence Downs in broad daylight. The motive could help lead him to the identities of the other two gunmen, who were shown fleeing the scene in hazy surveillance footage.

But then the detective received an unexpected call from the Bureau of Alcohol, Tobacco, Firearms and Explosives. An agent there had a question for him: Are you investigating a guy named Michael Lockhart?

"Why?" Murray asked.

The next few words were shocking enough to knock him backward. Lockhart, Murray was told, was working for the bureau.

Murray had learned plenty about Lockhart since he was identified as one of the Downs shooters, but the detective didn't see *this* coming.

Lockhart had sold numerous guns to the agency, pocketing thousands of dollars along the way.

The feds routinely turned people like Lockhart into assets. Some might start out selling a handful of weapons to an agent under the guise of getting guns off the streets. But guys in Lockhart's shoes usually end up buying weapons or drugs for the ATF to help build cases against traffickers to work off their own legal woes.

It's unclear how, exactly, Lockhart first ended up on the ATF's radar, but the bureau came to view him as a valuable resource. Nationwide, the agency had more than 1,800 registered informants that it paid about $4.3 million annually. Like all other ATF informants, Lockhart was supposed to follow strict rules that he would not commit any new crimes and he had to sign an agreement acknowledging he understood the bureau would terminate its arrangement with him if he did so.



240

Murray realized Lockhart was more complicated than he'd first thought. But he'd seen people even in his own line of work dabble in elaborate deceptions. There were patrol cops who robbed drug dealers and sold heroin, and even a detective who tried to help his girlfriend get away with murder. Living a lie could be easy if you had enough practice.

Murray and his then-boss, Lt. John Walker, met with members of the ATF, along with Cydney Pope, a no-nonsense Philly assistant district attorney who prosecuted cases that came out of Southwest Detectives.

There were particulars to sort out: Should the feds take over the investigation? Was Lockhart the primary target, or should a bigger name like Jerry "Boog" Brooks be the main focus?

Left unsaid was whether the ATF had done any soul-searching over whether it had been a good idea to pay Lockhart to continue to traffic in the very things that had proven to be his downfall so many times in the past. "Guys like that are always teetering on a line," Walker would later say. "Sometimes they jump over."

A dose of unsettling news soon followed.

George Fetters, a detective in the Homicide Unit, contacted Murray about a case he'd just picked up. Fetters had been on the job for more than 30 years, and had worked with Joe's father back in the 1980s and '90s, when both were young cops in the Badlands of North Philly, tasked with tracking down murder suspects. Just hearing Fetters' voice reminded Murray of how badly he wanted to be in Homicide.

Fetters only had bare-bones information. Someone had walked up behind a young guy on tiny Norfolk Street near 55th in West Philly in the wee small hours on Aug. 22, and shot him several times without warning.

Doctors at Penn Presbyterian Medical Center did what they could, but the victim didn't make it. His name was Hassan Williams.

The murder scene was only a few blocks away from where Lawrence Downs had been shot. Perhaps, Fetters said, the two

41

cases were connected. They had retraced Williams' final steps. He was cut down just a few minutes after he stepped outside of an old watering hole on Baltimore Avenue, the Commodore Lounge.

Murray recognized the Commodore from digging recently in the Lockhart family files. On Oct. 1, 2008, Michael Lockhart's father walked out of the Commodore and was shot 22 times by a man clutching an AK-47, supposedly over an old unpaid debt. The shooter, later identified as Jabok Timbers, is serving a 15- to 30-year prison sentence.

Whether the Downs and Williams shootings were linked at all was unclear to Murray. But the proximity of the two shootings — and the bar's link to Lockhart's father — made Murray think more about his family history, and the possibility that some of this bloodshed was fallout from a seven-year-old slaying.

It had been 11 days since Lockhart stole three guns from Jerry "Boog" Brooks, the head of a small West Philly drug gang, and blamed the theft on Williams, Downs, and another man, Kashif Love. One was dead, and another was paralyzed. What would happen to the third?

HOOKED ON OUR
NARRATIVE JOURNALISM?
Subscribe now to support our work and get more well-crafted stories like this. Get unlimited digital access for just $0.99 for the first four weeks.

The longer it took Murray to get Lockhart in custody, the more likely it seemed that somebody else would end up riddled with bullets.

Still, he wanted to move carefully. Lockhart tended to be armed. It didn't seem wise to try to grab him in North or West Philly, in neighborhoods filled with children. So Murray reached out to the ATF with a small request: Could the feds ask their asset to come in for a meeting?

Around lunchtime on Sept. 11, 2015, Lockhart made his way to the U.S. Custom House, an elegant, Depression-era art deco

42

building at Second and Chestnut Streets in the heart of
Philadelphia's historic district.

The Custom House mostly attracts travelers who need to obtain
passports, but the ATF occupies office space there, too.
Lockhart headed to a small conference room on the second
floor, and made some small talk with a few agents. For all he
knew, this was just a conversation about the next handful of
guns he might help them take off the streets.

But then a door swung open, and in walked Murray.

Lockhart knew something was up, but he kept smiling and
chatting with the agents.

"When I saw how he interacted with the feds, I knew what kind
of person I was dealing with," Murray would later say. "He was a
bulls—er, a con man."

Murray wasted little time explaining why he was there.

"You've been identified in a shooting," he told Lockhart. "You're
under arrest."

Lockhart seemed unfazed. Murray was another obstacle to
overcome, another person who needed to be persuaded. There
might be a way out of this trap.

Murray had so many questions for Lockhart, but this wasn't the
place to ask them. He needed him alone. He needed him back in
the Southwest Detectives office where he had spent weeks
rehearsing for this moment.

**COMING TOMORROW:**
*Detective Joe Murray finally gets to interrogate Michael Lockhart and finds
surprising information on the suspect's cellphone.*

# Undercover Gangster

**THIS SERIES IS BASED** on hundreds of pages of court documents, police records

43

and newspaper accounts, as well as interviews with: Michael Lockhart,
Yolanda Lockhart, Audrey Wallace, Lawrence Downs, Mary Anne Murray,
Philadelphia Police Detective Joe Murray, Officer Joe "Reds" Murray, Lt.
John Walker, Detective George Fetters, Assistant District Attorney Cydney
Pope, Senior Deputy Attorney General Robert Reed, ATF Special Agent
Charlene Hennessy, Philadelphia Prisons spokeswoman Shawn Hawes,
Marla Davis Bellamy and Colwin Williams of Philadelphia Ceasefire,
attorneys Edward Meehan and Anthony Petrone, and Scott Charles of
Temple University Hospital. Staff writer Barbara Laker contributed
reporting.

IN THEIR
FATHERS'
FOOTSTEPS
PART 1

PORTRAIT OF
A SUSPECT
PART 2

ANOTHER
TWIST,
ANOTHER
CRIME
PART 3

INTERROGATION
PART 4

THE
RECKONING
PART 5

STORY: **DAVID GAMBACORTA**    ILLUSTRATIONS: **AMY JUNOD**

ONLINE PRODUCTION AND DESIGN: **JARED WHALEN AND GARLAND POTTS**    EDITING: **JAMES NEFF**

COPY EDITING: **GINA ESPOSITO**    VISUAL EDITOR: **FRANK WIESE**    PROJECT MANAGER: **ELLEN DUNKEL**



The Philadelphia Inquirer

TWITTER    FACEBOOK    INSTAGRAM

NEWS & INFO

News
Sports
Entertainment
Business
Health
Food
Life
Opinion
Archives
Special Reports

MARKETPLACE

Inquirer Store
Find a Home
Job Listings
Special Sections
All Classifieds

MOBILE APPS

Inquirer News
Philly Sports
Now

ABOUT US

About The Philadelphia
Inquirer
Advertise
Contact Us
Licensing & Permissions
Photo Reprints
Newspapers in Education
Jobs & Internships
Inquirer Events
Acel Moore Workshops
Newsroom Staff

THE INQUIRER

Digital Edition
Subscribe
Subscriber Services

THE DAILY NEWS

Digital Edition
Subscribe
Subscriber Services

© 2019 The Philadelphia Inquirer, LLC    Terms of Use  /  Privacy Policy

44

Tuesday, October 08, 2019 | **Today's Paper**

# The Philadelphia Inquirer



<button>Unlimited Access</button>   <button>Log In</button>

**NEWS**  **SPORTS**  **BUSINESS**  **OPINION**  **POLITICS**  **ENTERTAINMENT**  **LIFE**  **FOOD**  **HEALTH**  **REAL ESTATE**  **OBITUARIES**  **JOBS**  🔍  ☰

PORTRAIT OF A SUSPECT

ANOTHER TWIST, ANOTHER CRIME

✦ INTERROGATION

THE RECKONING

# Interrogation

### PART 4

Story by David Gambacorta

*Illustrations by Amy Junod*

f   🐦   🗞   ✉   🔗

Thursday, November 16, 2017

ichael Lockhart sat across from Detective Joe Murray at a cramped desk on the second floor of Southwest Detectives' headquarters at 55th and Pine. They were so close, their knees practically touched.

There was something inevitable about this moment, this pairing — the cop and the con man who had both spent their lives trying to fill the shadows that were cast by their fathers. Had they grown up with different role models, it's easy to imagine their paths would have never crossed.

Murray didn't know what Lockhart would say, if anything, about the morning of Aug. 18 on Angora Terrace, when 31-year-old Lawrence Downs was shot 14 times.

Case 2:13-cr-00067-JD   Document 50   Filed 06/05/20   Page 46 of 55

But Murray had leverage. He had tracked down surveillance footage of Lockhart and three others fleeing the scene. Using the mug shot database, he'd painstakingly identified one getaway driver solely from a tattoo on his forearm. And Downs, recovering in his hospital bed where he lay paralyzed, had told him Lockhart had been one of the shooters who tried to kill him.



Still, the interrogation could be tricky. Lockhart wasn't just the son of a murdered drug dealer; he had a politician's knack for schmoozing, and was cunning enough to pull off living parallel lives, volunteering with the anti-violence nonprofit Philadelphia CeaseFire and selling guns to the ATF, all the while creating mayhem with a West Philly drug gang.

However Lockhart was going to play it, Murray knew pounding the desk and demanding answers weren't going to get him anywhere.

Lockhart mentioned that he did a lot of volunteer work for CeaseFire, and casually dropped the names of politicians and law enforcement types he'd met through the nonprofit.

Murray thought Lockhart was trying to convince him they were both on the same team, a couple of guys who were each doing their part to address Philly's gun-violence epidemic.

46

He kept the tone light for the first couple of hours. Then he offered Lockhart a break and a free meal. After Lockhart dined on chicken fingers, fries and a Coke, they started talking again.

It was about 2:30 a.m. on Sept. 12 when Murray started putting Lockhart's words down on paper.

**THERE WAS SOMETHING INEVITABLE ABOUT THIS MOMENT, THIS PAIRING – THE COP AND THE CON MAN WHO HAD BOTH SPENT THEIR LIVES TRYING TO FILL THE SHADOWS THAT WERE CAST BY THEIR FATHERS.**

"Michael," he said, "please tell me what you know about the events leading up to the shooting that occurred on August 18, 2015."

Jerry "Boog" Brooks, the head of a small West Philly drug gang, had asked one of his friends, Kerry Foster, to hide three of his guns for a few days, Lockhart told the detective.

The guns inexplicably vanished from Foster's house on Aug. 11. Lockhart had been there that night, hanging out for a few hours while Foster inked a tattoo on his ribs.

He carefully steered Murray toward his accomplices while minimizing his role.

Another friend had actually taken the guns, Lockhart insisted. He gave the name of someone who, conveniently, was behind bars on an unrelated murder charge.

Murray listened carefully, acutely alert despite the long day.

A neighbor claimed he saw Downs and two other men, Hassan Williams, and Kashif Love, near Foster's house the day after the weapons disappeared, Lockhart explained to the detective. Brooks called for all three to be murdered, he said.

Can I see your phone? Murray asked at one point.

He had already gotten a search warrant for the phone but didn't want to reveal it until he saw how Lockhart decided to play things.

Lockhart handed it over, and Murray opened the "Notes" app.

47

There it was, at the top of the screen: Lawrence Downs' address. The time stamp revealed it had been entered Aug. 17, the day before Downs was gunned down on his bike.

"Why did you put that in?" Murray asked.

Lockhart didn't have a good answer. He had to scramble.

He admitted he was down the block when Downs was shot on Angora Terrace. But he claimed he wasn't one of the shooters.

"I heard the first shot and then a bunch more," Lockhart said. "I covered my ears and when the shooting stopped I saw them walking off."

At this point, Murray felt he had as much as he was going to get tonight. He had Lockhart shipped off to the city detention center in the Northeast. He was charged with attempted murder, aggravated assault, conspiracy, and a host of other charges. Bail was set at $2.5 million.

Assistant District Attorney Cydney Pope was tasked with prosecuting the case. She was 34, and her steely blue eyes narrowed with intensity whenever she discussed the cold-blooded ambush of Lawrence Downs. She'd promised Downs and his family that his attackers would not get away scot-free.

But she and Murray had worked on numerous investigations in the past, and both knew that well-built cases could crumble on their way to conviction as witnesses recanted and stories changed. They needed more evidence to buttress an eventual prosecution. Their solution: Spend nights and weekends on their own time poring over a couple of years of information pulled from Lockhart's cellphone. Printed out, it filled 4,000 pages.

Text messages gave Murray and Pope a glimpse into Lockhart's ability to operate in different worlds at the same time. In one instance, he texted a friend about wanting to get his hands on more guns — all while he was waiting at Philadelphia International Airport to catch a flight to Illinois, where he and his CeaseFire cohorts were scheduled to share their gospel of hard truths with some prison inmates.

Deep in his Lockhart research, Murray found himself pulled

48

away and detailed to the papal security beat for several days as Philadelphia was bracing for a late-September visit from Pope Francis. He amused himself with sarcastic tweets while he tasked with keeping tabs on some Center City businesses. "Secret Service agents LOVE sunglasses," he wrote. "I mean loooooooooove."

**HOOKED ON OUR NARRATIVE JOURNALISM?**

Subscribe now to support our work and get more well-crafted stories like this. Get unlimited digital access for just $0.99 for the first four weeks.

He and Cydney Pope soon turned up evidence of more criminal behavior, such as an armed home invasion in June 2015. Lockhart and two other men allegedly barged into the home of an 82-year-old woman in West Philly and ran through the house, looking for valuables to steal. Lockhart was armed with a gun, but still flashed some of his charm.

## TEXT MESSAGES GAVE MURRAY AND POPE A GLIMPSE INTO LOCKHART'S ABILITY TO OPERATE IN DIFFERENT WORLDS AT THE SAME TIME.

"He was very polite," the elderly woman would later say. "He asked me if I wanted a glass of water."

The trio darted out of the house empty-handed, only to hear the shriek of police sirens growing closer. Lockhart had an idea. He texted a fellow volunteer at CeaseFire, and asked him to call 911. Tell the dispatcher you see someone with a gun in the area, Lockhart told him.

He hoped the bad information would distract the patrol cops closing in on his location.

Lockhart made it out of the neighborhood without being caught, but not because of any clever scheme. The 911 operator immediately realized that Lockhart's pal was calling from North Philly to offer eyewitness information about an unfolding crime in West Philly.

Continuing to scour through the phone records, Murray and Pope unearthed a key find: a photo of Lockhart clutching Jerry Brooks' guns.

It had been taken more than a month after the guns vanished.

Michael Lockhart's luck may have finally run out.

49

**COMING TOMORROW:**

*At a long-awaited trial, a prosecutor believes she has enough evidence to convict Michael Lockhart but then he springs one last surprise.*

# Undercover Gangster

THIS SERIES IS BASED on hundreds of pages of court documents, police records and newspaper accounts, as well as interviews with: Michael Lockhart, Yolanda Lockhart, Audrey Wallace, Lawrence Downs, Mary Anne Murray, Philadelphia Police Detective Joe Murray, Officer Joe "Reds" Murray, Lt. John Walker, Detective George Fetters, Assistant District Attorney Cydney Pope, Senior Deputy Attorney General Robert Reed, ATF Special Agent Charlene Hennessy, Philadelphia Prisons spokeswoman Shawn Hawes, Marla Davis Bellamy and Colwin Williams of Philadelphia Ceasefire, attorneys Edward Meehan and Anthony Petrone, and Scott Charles of Temple University Hospital. Staff writer Barbara Laker contributed reporting.

50

U.S. DEPARTMENT OF JUSTICE                          FEDERAL BUREAU OF PRISONS

| TO:(Name and Title of Staff Member) | DATE: 11/19/19 |
| *Unit Manager* | |
| FROM: *Dee L. Downs* | REGISTER NO.: *46528-066* |
| WORK ASSIGNMENT: *Gate Pass* | UNIT: Brady *A*   Cube# *1* |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.

Per the instructions of Mr. Snider, I am submitting this notice informing you of my submission of ~~this~~ BP-8 and Request of support For my up coming Motion For Compassionate Release due to extraordinary and compelling Reasons; Pursuant to the Failing health of my Parents. Please see attach — my BP-8 submission to your Attention

Thanks

Rec'd
12/1/19

(Do not write below this line)

*Dee L. Downs*

DISPOSITION:

| Signature Staff Member | Date |
|---|---|

Record Copy - File; Copy - Inmate

PDF

Prescribed by P5511

This form replaces BP-148.070 dated Oct 86 and BP-S148.070 APR 94

DOWNS, Dee
Register No.: 46528-066
Brady A
Page 1

---

### Inmate Request to Staff Response

This is in response to your Inmate Request to Staff dated December 1, 2019, wherein you request an Elderly Compassionate Release/Reduction in Sentence (RIS) in accordance with the First Step Act, specifically extraordinary or compelling circumstances.

In accordance with Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. 3582 and 4205(g), in the case of "Requests based on non-medical circumstances -- death or incapacitation of the family member caregiver" only applies in cases pertaining to a "child" under the age of 18. The basis of your request pertains to your parents. As such, does not fall within the parameters of eligibility in accordance with PS: 5050.50.

Accordingly, your request is denied. If you are not satisfied with this response, you may appeal through the Bureau of Prisons, Administrative Remedy Process by obtaining an Informal Resolution form through your Correctional Counselor.

I trust this information is responsive to your inquiry.

Date 12/17/19

D. K. White
Warden

FILE COPY

52

U.S. DEPARTMENT OF JUSTICE

Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: Downs, Dee L                46528-066      Camp      FCI, Fort Dix, N.J.

LAST NAME, FIRST, MIDDLE INITIAL              REG. NO.              UNIT              INSTITUTION

**Part A- INMATE REQUEST** Warden - I was not provided the original BP-8 but - I have the Inmate Request Form - to serve as "Proof" I did attach - a BP-8 - "quote" - verbiage of that Request - which I am issuing as my BP-9 - Per the instructions of Mr. Snider - I am submitting this Notice informing you of my submission of this BP-8 and Request of Support for my up coming Motion for Compassionate Release due to extraordinary and compelling Reasons - Pursuant to the failing health of my Parents. Please see attach - my BP-8 Submission to your attention : Thanks

3-1-20
DATE                                                    SIGNATURE OF REQUESTER

**Part B- RESPONSE**

_____                                      _____
DATE                                                    WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE                              CASE NUMBER: 1008667-F1

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CASE NUMBER: _____

**Part C- RECEIPT**

Return to: _____

LAST NAME, FIRST, MIDDLE INITIAL              REG. NO.              UNIT              INSTITUTION

SUBJECT: _____

_____              ✪              _____
DATE              PRINTED ON RECYCLED PAPER              RECIPIENT'S SIGNATURE (STAFF MEMBER)

53

FPI-PEPR

BP-229(13)
APRIL 1982

Issued *[handwritten]*

**U.S. DEPARTMENT OF JUSTICE**
Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

| From: | Downs Dee L | 46528-066 | Camp | FCI, Fort Dix, N. |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A- INMATE REQUEST** Warden - I was not provided the original BP-8 but - I have the Inmate Request Form - to serve as "Proof" I did attach - a BP-8 - I "quote" - verbiage of that Request - which I am issuing as my BP-9 - Per the instructions of Mr. Snider - I am submitting this Notice informing you of my submission of this BP-8 and Request of Support For my up coming Motion For Compassionate Release due to extraordinary and compelling Reasons - Pursuant to the Failing health of my Parents. Please see attach - my BP-8 Submission to your attention. Thanks

_3-1-20_
DATE

_____
SIGNATURE OF REQUESTER

**Part B- RESPONSE**

_____
DATE

_____
WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response*

**ORIGINAL: RETURN TO INMATE**

CASE NUMBER: _1008667-F1_

CASE NUMBER: _____

54

**Part C- RECEIPT**

**DOWNS, Dee Lawrence**
Register No. 46528-066
Remedy No. 1008667-F1

---

### Part B - Response

This is in response to your Request for Administrative Remedy, in which you appear to request reconsideration of a Compassionate Release/Reduction in Sentence (RIS) in accordance with Program Statement 5050.50.  Specifically, you request a RIS/Compassionate Release based on your parents' ailing condition.

Records reveal you submitted an Inmate Request to Staff in November 2019 at your previous institution, requesting Compassionate Release based on your parents' medical condition.  That request was denied on December 17, 2019, as you did not submit the request under one of the approved categories.  Specifically, in accordance with Program Statement 5050.49, <u>Compassionate Release/Reduction in Sentence, Procedures for Implementation, 18 U.S.C. 3582(c)(1)(A) and 4205 (g)</u>, an inmate may initiate a request for consideration only when there are particularly extraordinary or compelling circumstances which could not reasonably have been foreseen by the court at the time of sentencing.  An inmate must file the request under a specific category enumerated in the above Program Statement.  The medical condition of an inmate's parent(s), is not an enumerated category under the above policy.  Therefore, your request is denied.

If you are dissatisfied with this response, you may appeal to the Northeast Regional Director, Federal Bureau of Prisons.  Your appeal must be received in the Northeast Regional Office, U.S. Customs House, 2nd and Chestnut Streets, Philadelphia, PA. 19106, within 20 calendar days of the date of this response.

_____                         3/13/20
David E. Ortiz                                   Date
Warden

55